**SO ORDERED.**

**SIGNED this 19 day of July, 2018.**

_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:

LIONEL L. YOW

    DEBTOR

CASE NO.
11-06011-5-SWH
CHAPTER 7

## ORDER ALLOWING MOTION TO SELL FREE AND CLEAR OF INTERESTS

The matter before the court is the Motion to Approve Sale of Assets Free and Clear and Establish Sales Procedure filed by the chapter 7 trustee on January 8, 2018, Dkt. 713 (the "Motion"). Objections to the Motion were filed by (1) Connie and Mark Yow on January 25, 2018, Dkt. 723; (2) Holly Ridge Ventures, LLC and Douglas Leech on January 25, 2018, Dkt. 725; and (3) Hark Properties, LLC and Henry E. Miller, Jr. on January 29, 2018,[1] Dkt. 727. Two hearings on the Motion were held in Raleigh, North Carolina, the first on February 13, 2018, and the second on March 6, 2018. The court took the matter under advisement, in part, after the second hearing to determine the narrow issue of enforceability of rights of first refusal contained in the operating

---

[1] The Objection filed by Hark Properties, LLC and Henry E. Miller was resolved at the hearing.

agreements at issue. After consideration of the case record, pleadings, and arguments of counsel, the Motion will be allowed.

## BACKGROUND

Lionel L. Yow (the "Debtor" or "Mr. Yow") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 5, 2011. In an attachment labeled "Exhibit A" to his schedules filed on September 2, 2011, Dkt. 46, Mr. Yow listed full or partial ownership interests in seventy-one limited liability companies (collectively, the "LLCs"). A joint motion to appoint chapter 11 examiner was filed by four creditors on January 20, 2012, Dkt. 164, and a consent order appointing a chapter 11 examiner was entered by the court on February 22, 2012, Dkt. 187.

On October 2, 2012, a motion to appoint a chapter 11 trustee or convert the case to chapter 7 was filed by the same four creditors, in which the movants contended that good cause existed to appoint a chapter 11 trustee. Dkt. 324. On October 30, 2012, the court allowed the motion and appointed John A. Northen (the "Trustee") as the chapter 11 trustee pursuant to 11 U.S.C. § 1104. Dkt. 356. Following his appointment, the Trustee initiated an adversary proceeding to determine the bankruptcy estate's ownership interests in the LLCs and prepared to liquidate estate assets.

On May 5, 2015, Mr. Yow filed a motion to convert his chapter 11 case to one under chapter 7, contending that conversion to chapter 7 would facilitate a more expeditious and efficient liquidation of estate assets. Dkt. 549. The court entered an order converting the case to chapter 7 on May 19, 2015, Dkt. 550, and concurrently appointed Mr. Northen as the chapter 7 trustee. Dkt. 553.

The Trustee has administered the majority of the bankruptcy estate's assets and is holding the sum of $1,749,962.50 in funds available for distribution. The remaining assets to be liquidated consist of membership interests in the LLCs and other corporate entities. Specifically, the assets

the Trustee proposes to sell through the Motion are: (1) a one-quarter interest in North Shore Golf & Ocean Club, North Shore Holdings, LLC, and North Shore Inn, LLC; (2) a one-sixth interest in Decoy Investments, LLC (the "Decoy Interest");[2] (3) a one-half interest in Yow Mercedes Investments, LLC (the "Mercedes Interest"); (4) a one-third interest in Sneads Ferry Homes, Inc.; (5) one-half interests in Dockside Restaurant & Bar WB, Inc. and DWBI 0911, LLC; (6) a one-third interest in Yow's Highway 50 Investments, LLC and Highway 50 Development Company, Inc.; (7) a 43 percent interest in Smith Creek Station, LLC; and (8) a 15.38 percent interest in Villages of Devinshire, LLC. The issue currently before the court is whether the Trustee has the right to sell the Debtor's economic interest in Decoy and Mercedes without first offering those interests to the other members.

Decoy Investments, LLC ("Decoy") was formed and organized in the state of North Carolina on October 20, 2005 pursuant to the North Carolina Limited Liability Company Act (the "NC LLC Act").[3] At formation, Decoy had two members, the Debtor and Connie Yow, who executed an operating agreement to govern Decoy on October 20, 2005 (the "Decoy Operating Agreement"). At present, Decoy has three members: the Debtor holds a one-sixth interest; Connie Yow holds a one-sixth interest; and Holly Ridge Ventures, LLC holds the remaining two-thirds interest. No motion to assume or reject the Decoy Operating Agreement has been filed.

Yow Mercedes Investments, LLC ("Mercedes") was formed and organized in the state of North Carolina on May 23, 2007, pursuant to the NC LLC Act. Mercedes has at all times had two members with one-half interests in the LLC: the Debtor and Mark Yow. In conjunction with the formation of Mercedes, the Debtor and Mark Yow executed an operating agreement (the

---

[2] In Adversary Proceeding No. 14-00134-8-SWH, the court previously determined that the Debtor owned a one-sixth interest in Decoy.

[3] The North Carolina Limited Liability Act is codified at Chapter 57D of the North Carolina General Statutes.

3

"Mercedes Operating Agreement"). No motion to assume or reject the Mercedes Operating Agreement has been filed.

## ISSUES AND CONTENTIONS

The Trustee seeks to liquidate the Debtor's economic interest in Decoy and Mercedes. He maintains that the Mercedes Operating Agreement and Decoy Operating Agreement (collectively, the "LLC Operating Agreements") explicitly provide for the transfer or assignment of "rights to receive income" free from restriction, and that the transfer restrictions contained in the LLC Operating Agreements, as outlined below, apply only to the Debtor's non-economic interests. Further, the Trustee maintains that provisions granting certain purchase option rights to the LLCs are either invalid under the Bankruptcy Code or have expired. As a result, he contends that he may sell the Debtor's economic interests in Mercedes and Decoy without first offering those interests to other members.

On the other hand, the objecting parties contend that the LLC Operating Agreements afford them valid rights of first refusal and that the proposed sales procedures fail to recognize those rights. In addition, with respect to the Mercedes Interest, Mark Yow contends that written approval from all other Mercedes members is required before any sale to a third party may be consummated.

Thus, the issue before the court is whether certain transfer restrictions contained in the LLC Operating Agreements are valid, enforceable, and binding on the Trustee. If so, the court must consider how those provisions impact the Trustee's sale of the Debtor's remaining LLC interests.

## DISCUSSION

**I.     Are the LLC Operating Agreements Executory?**

Although neither party raised the issue, cases analyzing the right of the bankruptcy estate with respect to similar interests typically begin with an analysis of whether the applicable operating

agreements are executory. *See, e.g.*, *In re Garrison-Ashburn, L.C.*, 253 B.R. 700, 708 (Bankr. E.D. Va. 2000). If the LLC Operating Agreements are executory, then the Trustee could circumvent any question related to the transfer rights by simply rejecting the LLC Operating Agreements.

The determination of whether the LLC Operating Agreements are executory establishes which provisions of the Bankruptcy Code govern this dispute. If the LLC Operating Agreements are executory in nature, then "the panoply of rules in § 365 apply to affect or alter a trustee's rights and powers." *In re Warner*, 480 B.R. 641, 649 (Bankr. E.D. Va. 2012) (citations omitted). On the other hand, if the agreements are not executory, then the court need not consider § 365 in evaluating the effect and enforceability of an operating agreement's language. *See In re First Protection, Inc.*, 440 B.R. 821 (9th Cir. B.A.P. 2010) (explaining that if an operating agreement "is an executory contract . . . [then] § 365 governs the trustee's rights rather than § 541(c)(1)").

Section 365(a) of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract . . . of the debtor." 11 U.S.C. § 365(a). If an LLC operating agreement is executory in nature, two subsections of § 365 may affect a trustee's rights: §§ 365(c) and (e). Section 365(c) provides that a trustee may "not assume or assign any executory contract . . . if applicable law excuses a party . . . from accepting performance from or rendering performance to a [non-debtor]." 11 U.S.C. § 365(c)(1)(A). In addition, § 365(e)(1) renders contractual *ipso facto* clauses invalid. Specifically, § 365(e)(1) states:

> [A]n executory contract. . . may not be . . . modified, and any right or obligation under such contract . . . may not be terminated or modified . . . solely because of a provision in such contract . . . that is conditioned on –
> \* \* \*
> (B) the commencement of a case under this title; or
> (C) the appointment or taking possession by a trustee in a case under [Title 11] . . .

11 U.S.C. § 365(e)(1). However, § 365(e)(2) operates as an exception to the general invalidation of *ipso facto* clauses contained in § 365(e)(1). Section 365(e)(2) allows for the enforcement of an

5

*ipso facto* clause where the underlying contract is nonassignable or unassumable pursuant to state law.[4] 11 U.S.C. § 365(e)(2). If applicable to the LLC Operating Agreements at issue here, § 365(e)(2) would "permit[] the enforcement of state and contract law restrictions on the Trustee's rights and powers." *In re Ehmann*, 319 B.R. 200, 202 (Bankr. D. Ariz. 2005).

The Bankruptcy Code does not define the term "executory." As a result, courts employ various tests to determine whether an agreement is executory in nature. The United States Court of Appeals for the Fourth Circuit adopted and applies the "Countryman" standard, which defines an "executory contract" as one where "obligations of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other." *Gloria Mfg. Corp v. Int'l Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (quoting Vern Countryman, *Executory Contracts in Bankruptcy*, 57 MINN. L. REV. 439, 460 (1973)). Courts must individually examine the operating agreement at issue and determine "whether there are unperformed obligations on the part of the parties," such that the agreement may be classified as executory for purposes of § 365. *In re Tsiaoushis*, 383 B.R. 616, 620 (Bankr. E.D. Va. 2007).

After reviewing the LLC Operating Agreements, the court finds that they are not executory. Both agreements required the Debtor and another member to make an initial *de minimis* capital contribution. In terms of ongoing responsibilities, the LLC Operating Agreements oblige the

---

[4] Section 365(e)(2) provides:
 (2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
    (A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
        (ii) such party does not consent to such assumption or assignment; or
    (B) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

members to conduct and attend an annual meeting, but do not otherwise obligate the members to perform any managerial duties. The LLC Operating Agreements frame the members' future responsibilities as speculative in nature and do not delineate or specify any required action or outstanding material obligations. With no unperformed obligations remaining on behalf of the members, the LLC Operating Agreements do not meet the well-established Countryman definition of executory.

Because the LLC Operating Agreements are not executory, § 365 does not apply, and the Trustee cannot assume or reject the agreements. Further, even if the LLC Operating Agreements could be assumed or rejected, the sixty-day period to do so has expired. *See* 11 U.S.C. § 365(d)(1). Having found that the matter cannot be resolved with a simple finding that the Operating Agreements are executory contracts capable of being rejected, the court moves to the parties' arguments.

## II.    Are the Transfer Restrictions Invalid *Ipso Facto* Clauses?

As hinted to above and detailed below, the LLC Operating Agreements contain provisions restricting the transfer of membership interests, including a right of first refusal. Section 10.6 of the LLC Operating Agreements provides each LLC member with a purchase option (the "Purchase Option") upon the occurrence of certain events. Section 10.7 of the LLC Operating Agreements defines "Occurrences Triggering Purchase and Sale Rights." Events triggering those restrictions include death of a member, a voluntary transfer by a member, and an involuntary transfer by operation of law. "Involuntary transfer" is defined as follows:

> . . . If any Interest is transferred by operation of law . . . to any person other than the Company (*such as, but not limited to, a Member's trustee in bankruptcy, a purchaser at any creditor's or court sale. . . .*) . . . then the current owner or holder of such Interest shall be deemed by operation of this Agreement to have offered to sell such Interest for the Purchase Price and on the terms provided herein. The Company and the non-offering Members shall have the [Purchase Option] to

7

> acquire such transferred Interest . . . . The Primary Option Period under such [Purchase Option] shall be a period of [sixty days] commencing on the date the Company receives actual notice of such transfer . . . .

Dkt. 723, Ex. A at 16 (emphasis added).

An *ipso facto* clause is contractual provision that "modif[ies] the relationships of contracting parties *due to the filing of a bankruptcy petition.*" *In re Lehman Bros. Holdings, Inc.*, 422 B.R. 407, 414 (S.D.N.Y. 2010) (emphasis added). The Trustee maintains that because the Purchase Option is triggered upon the transfer of a membership interest to the bankruptcy estate by operation of law, it is an unenforceable *ipso facto* clause.

Three provisions of the Bankruptcy Code operate to invalidate *ipso facto* clauses: §§ 363(l), 365(e)(1), and 541(c)(1). As discussed above, § 365 nullifies *ipso facto* clauses contained in executory contracts. Section 541(c)(1) invalidates *ipso facto* clauses that prevent or affect the transfer of a debtor's assets to the bankruptcy estate. Section 541(c)(1) states, in relevant part:

> Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law--
>     (A)    that restricts or conditions transfer of such interest by the debtor; *or*
>     (B)    that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, *and* that effects or *gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property*.

11 U.S.C. § 541(c)(1)(A)–(B) (emphasis added). In enacting § 541(c), Congress intended to "invalidate restrictions on the transfer of property of the debtor, in order that all the interests of the debtor in property will become property of the estate." H.R. REP. NO. 595, 95th Cong. 1st Sess. (1977).

Finally, while § 541(c)(1)(B) nullifies *ipso facto* clauses that affect or prevent the transfer of a debtor's assets to the bankruptcy estate, § 363(l) invalidates provisions that affect a trustee's ability to freely liquidate estate assets. It provides, in relevant part,

> [T]he trustee may . . . sell [estate] property . . . notwithstanding any provision in a contract . . . that is conditioned . . . on the commencement of a [bankruptcy case], or on the appointment of *or the taking possession by a trustee in a [bankruptcy case]*. . . and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

11 U.S.C. § 363(l) (emphasis added). Bankruptcy courts routinely invalidate *ipso facto* clauses based on these three statutory provisions. *See Lehman Bros. Holdings, Inc.*, 422 B.R. at 415 (explaining that "it is now axiomatic that *ipso facto* clauses are, as a general matter, unenforceable"); *see also In re W.R. Grace & Co.,* 475 B.R. 34, 152 (D. Del. 2012) (noting that "because the whole purpose of filing for bankruptcy is to provide the debtor with a 'fresh start,' enforcement of *ipso facto* clauses would punish debtors by negating this central purpose").

Here, the Purchase Option provisions contained in Sections 10.6 and 10.7 of the agreements are not *ipso facto* in nature. The Purchase Option provisions do not, by themselves, forfeit, modify, or terminate the Debtor's interest in property; instead, they provide the other members an opportunity to purchase the Membership Interests. The *Debtor's* rights were not affected by the filing of the bankruptcy itself – the Trustee could have abandoned the membership interests, or otherwise taken no action with respect to those interests. Nothing contained in the Purchase Option provisions divests the Debtor or the bankruptcy estate of their interests in the LLCs. Instead, the rights of first refusal contained in Section 10.7 merely *permit* the other LLC members to purchase the LLC interests at an appraised price. As a result, the Purchase Option provisions are not *ipso facto* under §§ 541(c) or 363(l).

9

**III. Do the LLC Operating Agreements Prohibit the Trustee from Selling the Debtor's Economic Interests?**

Having found that the LLC Operating Agreements are not executory in nature and do not contain unenforceable *ipso facto* clauses, the court turns to governing law to determine whether the Trustee is entitled to sell the interests at issue. Both Decoy and Mercedes were formed in North Carolina, and North Carolina law "govern[s] . . . the internal affairs of every LLC, including the interpretation, construction, and enforcement of operating agreements . . . ." N.C. GEN. STAT. § 57D-1-02(a).

In North Carolina, an individual's interest in an LLC may be bifurcated into two parts: an "economic interest" and a "non-economic interest." An "economic interest" is statutorily defined as "[t]he proprietary interest of an owner in the capital, income, losses, credits, and other economic rights and interests of a limited liability company, including the right . . . to receive distributions." N.C. GEN. STAT. § 57D-1-03(10). The NC LLC Act also contemplates the potential for a mere "economic interest owner," which is defined as "[a] person who owns an economic interest but is not a member [of the LLC]." N.C. GEN. STAT. § 57D-1-03(10). With respect to the transfer of an economic interest, the LLC Act provides the following:

> An economic interest is transferable in whole or in part. The transfer of an economic interest or portion thereof does not entitle the transferee to become or exercise any rights of a member other than to receive the economic interest or portion thereof assigned to the transferee.

N.C. GEN. STAT. § 57D-5-02.

However, the NC LLC Act and North Carolina common law govern "only to the extent contrary or inconsistent provisions are not made in, or are not otherwise supplanted, varied, disclaimed, or nullified by, the operating agreement. . . ." N.C. GEN. STAT. § 57D-2-30(a). Here,

there are operating agreements in effect, so the court first looks to the specific terms of those agreements.

### A.     Decoy

The Decoy Operating Agreement defines a "Membership Interest" as follows:

> [A]ll of a Member's rights in the Company, including without limitation, the Member's share of the profits and losses of the Company, the right to receive distributions of the Company's assets, any right to vote, *and* any right to participate in the management of the Company. . . .

Dkt. 723, Ex. A at 2, § 1.1(p).

Section 10.1 of the Decoy LLC Operating Agreement begins by addressing the transferability of Membership Interests. It provides:

> The term "transfer" when used in this Agreement with respect to a Membership Interest includes a sale, assignment, gift, pledge, exchange or other disposition. A Member shall not at any time transfer its Membership Interest except in accordance with the conditions and limitations set out in Section 10.2. . . .

*Id.* at 13.

Section 10.2 outlines restrictions on transfers of Membership Interests, providing:

> *Any member may transfer or assign his rights to receive Income from the Company.* Furthermore, any Member may transfer his Membership interest to any [adult family member]. . . . Any further or other transfer of a Membership Interest shall only be allowed following written notice given to all other Members . . . and following a decision by [the other members] not to acquire the Membership Interest . . . upon the same terms and conditions as proposed for the transfer to the third party.

*Id.* (emphasis added).

Sections 10.3 and 10.4 outline the rights of a transferee. Specifically, "unless and until admitted as Member," a transferee "shall be [only] entitled to receive the distributions and allocations to which a Member would be entitled." *Id.* Sections 10.4 and 10.5 provide for the process by which a transferee may be admitted as a member. *Id.* at 13-14. Thus, the Decoy

11

Operating Agreement clearly contemplates the assignment of a member's rights to receive income without that assignee also being admitted as a "member" for other, non-economic purposes.

Section 10.6 provides each LLC member with a purchase option (the "Purchase Option") upon the occurrence of certain events. Section 10.6 outlines the Purchase Option, and the process by which it may be exercised, as follows:

> . . . This [Purchase Option] shall mean that the Company may exercise an option to purchase all or any portion of the Interest subject to the option for the Purchase Price and on the terms provided herein. The Company's option shall be forfeited unless it is exercised within the Primary Option Period . . . . If the Company does not elect . . . then the non-offering Members shall have the option to purchase all of the remaining Interest . . . . The non-offering members shall have thirty (30) days after the expiration of the Primary Option Period . . . in which to exercise their option. The Company and the non-offering Members shall forfeit their options unless, in the aggregate, the exercise options to purchase all of the Interest of the offering Member which is subject to options. . . .

*Id.* at 14.

As noted above, Section 10.7 defines "Occurrences Triggering Purchase and Sale Rights." Events triggering the Purchase Option include death of a member, a voluntary transfer by a member, and an involuntary transfer by operation of law. "Involuntary transfer" is defined in Section 10.7(c) as follows:

> . . . If any Interest is transferred by operation of law . . . to any person other than the Company (*such as, but not limited to, a Member's trustee in bankruptcy, a purchaser at any creditor's or court sale. . . .*) . . . then the current owner or holder of such Interest shall be deemed by operation of this Agreement to have offered to sell such Interest for the Purchase Price and on the terms provided herein. The Company and the non-offering Members shall have the [Purchase Option] to acquire such transferred Interest. . . The Primary Option Period under such [Purchase Option] shall be a period of [sixty days] commencing on the date the Company receives actual notice of such transfer . . . .

*Id.* at 16 (emphasis added).

The Decoy Agreement clearly allows the transfer of economic rights without any further qualification. Section 10.2 provides, "*Any member may transfer or assign his rights to receive*

12

*Income from the Company.*" *Id.* at 13 (emphasis added). The objecting parties maintain that the Purchase Option applies to the proposed sale, but the Purchase Option refers to the entire Membership Interest (defined in Section 1.1(p) as "*all* of a Member's rights in the Company, including without limitation, the Member's share of the profits and losses of the Company, the right to receive distributions of the Company's assets, any right to vote, *and* any right to participate in the management of the Company, *id.* at 2 (emphasis added)), not a proposed transfer of only the right to receive income. Accordingly, the Purchase Option, or right of refusal, simply does not apply to this transaction.

The Decoy Agreement and North Carolina law are consistent on the ability to bifurcate the interests, and the Decoy Agreement is clear that there are no restrictions on the transfer of a purely economic interest. Accordingly, the Trustee's Motion will be allowed with respect to the Decoy Interest.

### B.     Mercedes

The Mercedes Operating Agreement is nearly identical to the Decoy Operating Agreement, but varies in one key respect: the sentence in Section 10.2 providing that "Any member may transfer or assign his rights to receive Income from the Company" is followed by a conflicting sentence that states, "All or part of a Membership Interest may be transferred only by approval of all the Members . . . ." Dkt. 723, Ex. B at 14. As in the Decoy Agreement, "Membership Interest" is defined to include *all* of a Member's rights in the Company. *Id.* at 3, § 1.1(q).

Because the Mercedes Agreement appears to contradict itself, the court turns to general principles of contract interpretation. First, a court is "to determine and effectuate the intent of the parties, and the primary source for identifying this intent is the language of the contract itself." *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231 (4th Cir. 2007).

13

Further, "contract provisions should not be construed as conflicting unless no other reasonable interpretation is possible." *Ray D. Lowder, Inc. v. N.C. State Highway Comm'n*, 26 N.C. App. 622, 639, 217 S.E.2d 682, 693 (1975) (citations omitted). If a contract's provisions are conflicting, a court should "appl[y] specific provisions of a contract over more general provisions dealing with the same subject matter." *Levine v. Employers Ins. Co. of Wausau*, 887 F.3d 623, 636 (4th Cir. 2017) (applying Virginia law in an insurance dispute); *see also S. Ry. Co. v. Coca Cola Bottling Co.*, 145 F.2d 304, 307 (4th Cir. 1944) (explaining that "a presumption arises that the specific [contractual] provision, rather than the general, is controlling").

Here, the reference to a member's right to receive income is more specific than the defined term Membership Interest, which includes the right to receive income as well as delineated non-economic rights. Further, the court reads "all or part of a Membership Interest" not to mean "all or part of the rights," but "all or part" of the percentage interest that the particular member holds. In other words, the Mercedes Agreement contemplates the unrestricted transfer of economic rights, but the transfer of, for example, one-half of a member's entire Membership Interest is subject to the restrictions set forth in Section 10.2. This interpretation follows both of the rules delineated above: construing apparently conflicting provisions as consistent, and giving weight to the more specific language. Further, it "gives a reasonable meaning to all its provisions" rather than leaving "a portion of the writing useless or superfluous." *Ray D. Lowder, Inc.* 26 N.C. App. at 639, 217 S.E.2d at 693 (citations omitted).

As a result, the court reaches the same conclusion with respect to the Mercedes Interest that it does with respect to the Decoy Interest: the Operating Agreement specifically allows the transfer of the Debtor's economic interest without qualification. Because the language with respect to the Purchase Option is identical in the two agreements, the court's analysis of the inapplicability

of those provisions is equally pertinent here. Thus the Motion will also be allowed with respect to the Mercedes Interest.

## CONCLUSION

In his Motion, the Trustee seeks authority to sell only Mr. Yow's "bare economic interests" in the LLCs pursuant to the plain language contained in the first sentence of Section 10.2 of each agreement. He has not requested authority to sell or otherwise convey the non-economic interests. Further, nothing in this order or in the Bankruptcy Code prevents the Trustee from abandoning the non-economic interests pursuant to 11 U.S.C. § 554(a). In short, in reading the LLC Operating Agreements as a whole, it appears to the court that each LLC member has the unrestricted ability to transfer his right to receive income from the LLC, and the Trustee is merely invoking this right in the Motion.

Based on the foregoing, the Trustee's Motion is ALLOWED. At the hearing, the Trustee indicated he would offer the remaining estate assets in smaller lots of individual assets. Accordingly, the Trustee is directed to file an amended supplemental pleading setting forth the proposed lots of remaining estate assets to be sold, including real property and LLC interests, within fourteen (14) days of the date of this order.

**END OF DOCUMENT**